**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**MELISSA B.,**

     **Plaintiff,**

**vs.**                                              **CIVIL ACTION NO. 2:22-CV-00536**

**KILOLO KIJAKAZI,
ACTING COMMISSIONER
OF SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

     This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Order entered November 29, 2022 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the Plaintiff's Brief in Support of Complaint and the Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 8, 11)

     Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for remand (ECF No. 8), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 11); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court for the reasons stated *infra*.

**Procedural History**

The Plaintiff protectively filed her application for SSI on July 17, 2020 alleging her disability began on March 1, 2016[1] due to memory loss, migraines, pain in the left side of her neck, arthritis, tendinitis, a car wreck in 2016 resulting in 100 staples from her head to her neck, depression, anxiety, high blood pressure and high cholesterol. (Tr. at 15, 307, 332) Her claim was initially denied on November 2, 2020 (Tr. at 15, 165-177) and again upon reconsideration on March 17, 2021 (Tr. at 15, 181-187). Thereafter, the Plaintiff filed a written request for hearing on April 13, 2021. (Tr. at 188-190)

An administrative hearing was held on August 10, 2021, with a supplemental hearing subsequently held on March 8, 2022 before the Honorable Valerie A. Bawolek, Administrative Law Judge ("ALJ"). (Tr. at 56-94, 38-55) On April 11, 2022, the ALJ entered an unfavorable decision. (Tr. at 12-37) On August 23, 2021, the Plaintiff sought review by the Appeals Council of the ALJ's decision. (Tr. at 201-203) The ALJ's decision became the final decision of the Commissioner on March 3, 2022 when the Appeals Council denied the Plaintiff's Request. (Tr. at 1-6)

On November 23, 2022, the Plaintiff brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant, (hereinafter referred to as "the Commissioner") filed a Transcript of the Administrative Proceedings. (ECF No. 6) Subsequently, the Plaintiff filed a Brief in Support of Complaint (ECF

---

[1] The Plaintiff alleged that she stopped working as of December 30, 2015 "[b]ecause of my condition(s)." (Tr. at 332) The record also shows that the Plaintiff filed a prior claim for benefits that was denied on December 3, 2018 (Tr. at 95-120) and was denied review by the Appeals Council on October 30, 2019 (Tr. at 121-127).

No. 8); in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 11), to which the Plaintiff filed her Reply Brief (ECF No. 12). Consequently, this matter is fully briefed and ready for resolution.

**Plaintiff's Background**

The Plaintiff was 42 years old as of the application filing date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 416.963(c). (Tr. at 29) She graduated high school and had subsequently completed some college classes. (Tr. at 21, 66-67) She last worked as a cashier at 7-11, but had quit that job prior to being in a motor vehicle accident in 2016. (Tr. at 18, 67)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether the claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §

416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 416.920a(c):

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 416.920a(e)(4).

## **Summary of ALJ's Decision**

In this particular case, the ALJ determined that the Plaintiff satisfied the first inquiry because she had not engaged in substantial gainful activity since the application date of July 17, 2020. (Tr. at 18, Finding No. 1) Under the second inquiry, the ALJ found that the Plaintiff had the following severe impairments: cervical transverse process fracture with hardware placed; cervical and thoracic scoliosis; degenerative joint disease and facet arthritis; depression; anxiety; and cannabis use disorder. (Id., Finding No. 2) At the third inquiry, the ALJ concluded the Plaintiff's impairment did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 3)

The ALJ then found that the Plaintiff had the residual functional capacity ("RFC") to perform a range of light work except

> she can never climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She can occasionally reach overhead, bilaterally; she can frequently reach in all other directions, bilaterally; she can frequently handle and finger with the non-dominant left hand. She must avoid all exposure to hazards, such as unprotected heights; she can tolerate occasional exposure to extreme cold. Additionally, the claimant can perform no more than simple, repetitive tasks and can perform no customer service work; she can tolerate no more than superficial/occasional contact with the public as well as occasional interaction with supervisors and co-workers. She requires a low-stress work environment; i.e., a job without a fast pace or strict production quotas.

(Tr. at 22, Finding No. 4)

At step four, the ALJ found the Plaintiff was unable to perform any past relevant work. (Tr. at 29, Finding No. 5) At the fifth step, the ALJ determined that in addition to the immateriality of the transferability of job skills, the Plaintiff's age, education, work experience, and RFC indicated that there are jobs that exist in significant numbers in the national economy that she can perform. (Tr. at 29-30, Finding Nos. 6-9) Finally, the ALJ determined the Plaintiff had not been under a disability since July 17, 2020. (Tr. at 31, Finding No. 10)

**The Plaintiff's Challenges to the Commissioner's Decision**

The Plaintiff alleges the ALJ failed to reconcile the conflicts between the controlling RFC/hypothetical and the vocational expert's testimony: both in terms of the occasional overhead reaching and the simple, repetitive tasks and low stress restrictions. (ECF No. 8 at 8-11) The jobs identified by the vocational expert presented apparent conflicts, as they required frequent reaching and SVP reasoning level of 2 or 3 – these reasoning levels provide that the individual must be able to "understand and carry out **detailed** instructions" as well as to "**apply common sense understanding to carry out instructions furnished in written, oral, or diagrammatic form**." (Id. at 11)(**emphasis** in original) Additionally, the Plaintiff made objections about these issues in post-hearing(s) briefs, however, the ALJ never did rule upon these, and instead just issued the unfavorable decision. (Id. at 11-13) Since the ALJ did not explain or resolve these conflicts, or make a ruling on the Plaintiff's objections, remand is necessary. (Id. at 10, 13)

Next, the Plaintiff asserts that the ALJ failed to properly apply the psychiatric review technique in assessing her mental RFC restrictions, to the extent that it does not adequately accommodate the Plaintiff's moderate limitations in all broad areas of mental functioning. (Id. at

13-15)

The Plaintiff also argues that the ALJ did not complete the sequential evaluation process to the extent that she did not obtain testimony from the vocational expert that the Plaintiff could no longer perform her past relevant work. (Id. at 15-16) Because the ALJ did not complete the step four determination, her findings under step five are improper and cannot be relied upon. (Id. at 16) Moreover, the vocational expert who testified at the supplemental hearing was not privy to all the evidence related to the Plaintiff's vocational history – the Plaintiff's testimony regarding same during the initial administrative hearing. (Id. at 16-17) The ALJ's failure to provide the second vocational expert with all the Plaintiff's vocational history evidence also renders the step four determination incomplete, resulting in a suspect step five finding. (Id. at 17)

Finally, the Plaintiff argues that the ALJ did not consider the entire record pursuant to Social Security Ruling (SSR) 16-3p, specifically with respect to the Plaintiff's migraine headaches and chronic pain impairments. (Id. at 17-20) These impairments and their related symptomology were recognized by the testifying medical expert, Dr. Kweli Amusa, who opined as to the Plaintiff's RFC during the first hearing that was adopted in its entirety by the ALJ. (Id.) Additionally, the ALJ adopted in its entirety a mental RFC opinion provided by Dr. Gary Bennett's testimony. (Id. at 20) The Plaintiff contends this shows the ALJ failed to consider the Plaintiff's statements as they related to the severity of her symptoms. (Id. )

To correct all these errors, the Plaintiff asks the Court to remand this case. (Id.)

In response, the Commissioner contends that the ALJ in this case appropriately identified any conflicts between the RFC and the jobs identified by the vocational expert: the vocational expert acknowledged that there may be a conflict between the frequent reaching required in the

DOT[2] job descriptions and the occasionally reaching overhead restriction, but clarified that none of the jobs identified required overhead reaching. (ECF No. 11 at 9-12) Moreover, four of the six jobs (price marker, machine operator, office helper, and folder) identified by the vocational experts during the administrative hearings, each required a Reasoning Level 2 in the DOT, which this Court and the Fourth Circuit have recognized there are no conflicts with an RFC limitation to simple, repetitive tasks. (Id. at 12-13) Further, the vocational expert affirmed that her testimony was consistent with the DOT at the first hearing. (Id. at 13)

While the Plaintiff argues that the ALJ should have ruled upon her objections in her post hearing briefs, and relies upon HALLEX I-2-6-74, the Fourth Circuit has not provided any guidance regarding the issue of whether HALLEX is judicially enforceable, and numerous courts in this Circuit have held that HALLEX lacks force of law. (Id. at 14) The Commissioner points out that in her post hearing objections concerning the vocational expert's range of numbers used to identify the number of available jobs, the Plaintiff conceded that even reducing the total number of jobs by her proposed percentages still left hundreds of thousands of available jobs. (Id. at 14-15)

The Commissioner further argues that the ALJ performed the appropriate step three considerations, thoroughly evaluating the paragraph B criteria and explained her reasoning; the ALJ explained that the moderate limitations in the four areas of mental functioning identified using the psychiatric review technique are not an RFC assessment. (Id. at 16) Still, the ALJ's findings at steps two and three correlate with the limitations the ALJ set forth in the RFC, and discussed the

---

[2] **D**ictionary of **O**ccupational **T**itles

evidence that supported her findings, including the opinion of the testifying expert. (Id. at 16-18) The ALJ found that Dr. Bennett's testimony was persuasive since he appeared at both hearings, listened to all the testimony, cited to specific exhibits in the record and able to answer questions to clarify his opinion, and he had access to the most complete record; the Plaintiff's representative had no questions for Dr. Bennett at either hearing, but stated he was "very thorough." (Id. at 18) Also, the Plaintiff does not point out what evidence the ALJ failed to consider or that contradicts her conclusion that the Plaintiff was able to perform the light work outlined by the RFC. (Id.)

The Commissioner next asserts that the Plaintiff's argument concerning her past relevant work are not viable, and in any event, the ALJ determined she could not perform her past relevant work, thus any error at step four is harmless, because the ALJ would have reached the same result notwithstanding any alleged error. (Id. at 18-19) Further, the ALJ appropriately evaluated the Plaintiff's subjective complaints against the objective medical evidence and other evidence of record. (Id. at 19-20) While the ALJ did not mention every piece of evidence as it related to the Plaintiff's subjective complaints, she is not required to, however, she did consider all the relevant evidence, including the opinion testimony to conclude that the Plaintiff remained capable of a range of light work. (Id. at 20-21)

In sum, the Commissioner contends that substantial evidence supports the ALJ's decision and asks this Court to affirm. (Id. at 21)

In her reply brief, the Plaintiff reasserts that the ALJ did not identify or resolve the apparent conflicts between the vocational expert's testimony and the DOT; the Plaintiff contends that not only did the ALJ fail to ask the vocational expert if her testimony was consistent with the DOT, the ALJ also failed to inquire about any conflicts at all. (ECF No. 12 at 1-3) What is problematic

10

is that the Plaintiff's representative asked the vocational expert about the conflicts, and she did not

have the burden to prove the discrepancy, yet the ALJ adopted the testimony from the expert from

the supplemental hearing. (Id. at 3) To accept the ALJ's fifth step finding in this case would be

tantamount to allowing the Commissioner to improperly shift the burden to the Plaintiff, and leaves

the conflict unresolved, thus resulting in a fifth step decision unsupported by substantial evidence.

(Id.)

Additionally, the ALJ did not explain why she omitted the Plaintiff's moderate limitations

in concentrating, persisting, or maintaining pace from the RFC – the Plaintiff notes that the Fourth

Circuit found that an ALJ cannot summarily account for a claimant's limitations in this area of

functioning by restricting the hypothetical question to simple, routine tasks or unskilled work

because the ability to perform simple tasks differs from the ability to stay on task. (Id. at 3-5) The

Plaintiff again asks this Court to remand so that these errors can be corrected. (Id. at 6)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record, including the medical evidence,

pertaining to the Plaintiff's arguments and discusses it below.

**The Medical Record:**

On March 1, 2016, the Plaintiff was involved in a motor vehicle accident, transported via

ambulance to a local hospital, then transferred to Ruby Memorial Hospital (WVU Hospital), where

she would remain until discharge on March 10, 2016 (Tr. at 668-1876). Imaging studies and trauma

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

evaluations completed at the emergency room provided evidence of the following injuries: bilateral facet fracture C7-T1 (with subluxation), transverse process fracture C6, T1 anterior superior corner fracture, a right carotid artery injury, left vertebral artery injury, a dorsal epidural hematoma, various ligamentous injuries to the cervical spine, a scalp laceration, dislocation of the left carpometacarpal, and subarachnoid hemorrhage (Tr. at 576-579).

On March 2, 2016, the Plaintiff underwent major surgical procedures. (Tr. at 827-828). Prior to surgery, an MRI was performed on her cervical spine, which revealed: traumatic subluxation of C7 on T1 secondary to bilateral posterior column fractures, with additional multi-ligamentous and disc injury at C7-T1 level, superior endplate fracture of T1 anteriorly with 25% height loss, small dorsal epidural hematoma, and moderate left central canal stenosis at C5-C6 secondary to disc herniation with cord compression as well as mild central canal stenosis at C6-C7 due to disc bulge and ligamentum flavum hypertrophy (Tr. at 757, 738-739). Following surgery, a CT scan of the cervical spine was obtained and notes acute postoperative changes with improved alignment (Tr. at 743). X-ray studies completed in later 2016 on both the lumbar and thoracic spine render findings of facet arthrosis and hypertrophy, levoscoliosis, and degenerative change in the lumbar spine (Tr. at 2159). A thoracic spine X-ray provides findings of dextroscoliosis and osteopenia (Tr. at 2160).

Also due to the March 1, 2016 motor vehicle accident, the Plaintiff suffered a dislocation of the first carpometacarpal joint on the left, which was treated with a reduction and cast (Tr. at 746). On March 22, 2016, the Plaintiff attended a follow up visit, and an x-ray was performed, showing the CMC joint was relocated and appeared to be in good position and alignment (Tr . at 1898). On May 3, 2016, another follow-up x-ray was completed which showed a small osseous

fragment adjacent to the ulnar bone of the first metacarpal, most likely associated with the initial injury (Tr. at 1933). During a follow-up visit the same day, the Plaintiff's cast was removed, and all nerve and ligament motor nerve function testing was within normal limits; however, the thumb was stiff (Tr. at 1930). The Plaintiff was fitted with a splint to use 24/7 for 3 weeks, then was to begin weaning from the splint over the next four weeks (Id.).

WVU Neurosurgery follow-up treatment records from September 2016 indicate that the Plaintiff experienced some neurological side effects in the months following her back surgery, including mild headaches, neck and mid back pain, and radiating down her left lower extremity with complaints of generalized weakness and fatigue (Tr. at 1968). Treatment records that date indicate she weaned from her cervical collar on June 15, 2016, but reported left-sided neck pain radiating to her left shoulder occurring more often, intermittent left-hand weakness, and buttocks pain radiating down her right leg (Tr. at 1986). An MRI of the brain was obtained in November 2019 due to an increase in the Plaintiff's headaches, and the results of that study indicated no acute intracranial pathology and was otherwise unchanged; however, based on the report it is unclear if all or any of the cervical hardware was observed in this study (Tr. at 2094-2095).

Beginning in September 2016, the Plaintiff participated in physical therapy at Mountaineer Physical Therapy in Summersville, West Virginia. (Tr. at 1877-1896). She was assessed with cervical/upper thoracic fusion hypomobility and mid/lower thoracic hypomobility, as well as a postural dysfunction (Tr. at 1879). On discharge in November 2016, her posture, tenderness, muscle guarding, and spasticity were still present. (Tr. at 1894). There was little improvement in her cervical range of motion, and the therapist notes: "Patient has remained for the most part status quo since starting PT, met/partially met 2.5 goals, but postural deficits remain but does voice

13

improvement subjectively" (Tr. at 1895).

More recently, in October 2020, the Plaintiff was sent for a disability examination with Angela Brown FNP-C (Tr. at 625-630). On examination, the Plaintiff exhibited full range of motion in all extremities, including her spine, as well as full strength in lower and upper extremities with full grip strength; however, the Plaintiff continued to have limited range of motion in her cervical spine (Tr. at 628-629). Ms. Brown noted no curvature of spine, no tenderness or pain to palpation, and straight leg testing negative, however, the Plaintiff reported joint and cervical spine pain limiting her range of motion (Tr. at 627).

<u>Primary Care Provider Records:</u>

Various records from the Plaintiff's primary care provider, Donna Moore, NP, indicate that since August 2016 (Tr. at 2231) and lasting until the present, the Plaintiff reported pain in the left wrist and thumb: an x-ray of the left wrist obtained on October 19, 2019 showed mild degenerative changes in the base of the first metacarpal and greater multangular bone, which the radiologist noted was probably osteoarthritis (Tr. at 610); an x-ray of the left thumb was performed the same date which rendered similar results (Tr. at 609). On numerous occasions, treatment records showed findings of muscle spasms in the shoulders and neck, in addition to frequent subjective complaints of pain in her left wrist, left thumb, and bilateral shoulders (Tr. at 631-661, 2187-2238). On November 13, 2016, an x-ray of the right shoulder rendered findings of a mild degenerative change at the AC joint (Tr. at 2156).

On December 13, 2016, a prescription for Propranolol was given to the Plaintiff during a for migraine headaches, which the Plaintiff reported she had been experiencing since her car accident (Tr. at 2227). On January 10, 2017, records indicate that her migraine improved with

14

medication (Tr. at 2226).

On October 21, 2019, the Plaintiff reported having an increase in memory problems. (Tr. at 2203). A CT Brain study completed on March 1, 2016 rendered results of a traumatic subarachnoid hemorrhage in the left frontoparietal region, noting a tiny posterior parafalcine subdural hematoma (Tr. at 754). An additional CT Head was performed on December 10, 2016 which showed there may be some subtle white matter changes, though no evidence for acute intracranial change; an MRI was considered to be of further value (Tr. at 2150). Neurosurgery Clinic notes from WVU Medicine dated March 7, 2017 indicate neurosurgeon, Dr. Cohen, evaluated the Plaintiff's recent and remote memory, deeming both abnormal and poor for past and current events (Tr. at 1987). Additionally, her attention span and concentration were assessed as poor (Id.). Following this appointment, Dr. Cohen discharged the Plaintiff noting:

> She is unchanged overall, with some cervical soreness that has persisted despite PT, without true radicular [symptoms]. Cervical x-rays performed prior to her office visit reveal unchanged position of the screw/rod construct and unchanged overall alignment of her cervical spine. I advise continued non-surgical [treatment] of her muscular pain, and we will see [the Plaintiff] back on a prn basis.

(Tr. at 1988)

Mental Health Treatment:

The Plaintiff sought treatment for her mental health conditions in 2018 at Seneca Health Services. (Tr. at 2162-2186) On August 27, 2018, the Plaintiff was diagnosed with the following: Anxiety disorder, NOS, Depressive disorder NOS, and pseudobulbar affect (PBA) (Tr. at 2177). The Plaintiff was prescribed several medications, including Nuedexta, Cymbalta, Vistaril, and Ativan (Tr. at 2162-2186). There were various adjustments to the dosages of these medications based on the Plaintiff's reports of breakthrough symptoms. (Tr. at 2162-2186).

In November 2020, the Plaintiff reported to her primary care provider that she had stopped taking all of her medication from Seneca and experienced being anxious and depressed, not sleeping well, and irritable. (Tr. at 2191)  She was prescribed Lexapro for anxiety and depression and to return in one week and prn (Tr. at 2192).

In conjunction with this claim, on March 1, 2021, the Plaintiff was sent for a mental status evaluation with Larry J. Legg, M.A. (Tr. at 663-667).  The Plaintiff was noted to have arrived on time and drove herself, was clean and suitably dressed and was cooperative throughout the interview. (Tr. at 663) She exhibited a dysphoric mood and flat affect; normal speech; fully oriented; normal thought processes, thought content, and perception; good insight; normal psychomotor behavior; judgment was determined to be within normal limits; no suicidal or homicidal ideation; immediate, recent and remote memory were judged to be within normal limits; and concentration, persistence, and pace were judged to be within normal limits. (Tr. at 665-666) Mr. Legg's impressions were: Major Depressive Disorder, deemed recurrent and severe without psychotic feature; Generalized Anxiety Disorder; and moderate Cannabis Use Disorder (Tr. at 666).

Mr. Legg evaluated the Plaintiff again on September 28, 2021 (Tr. at 2251-2259). He administered the neurobehavioral cognitive status exam (Cognistat), the revealed that the Plaintiff was operating in all domains in the average range, although the Plaintiff received a mild impairment rating in memory. (Tr. at 2254-2255) On mental status examination, the Plaintiff again exhibited within normal limits in each category, although her concentration was deemed mildly deficient; she was within normal limits in social functioning during the evaluation. (Tr. at 2255) Mr. Legg's diagnoses were unchanged and the Plaintiff remained capable of handling her own

finances. (Tr. at 2255-2256)

**The Administrative Hearings:**

    <u>Dr. Kweli Amusa, Medical Expert Testimony:</u>

    At the initial administrative hearing, Dr. Amusa discussed the Plaintiff's physical impairments, acknowledging that she suffers with "some chronic pain" but determined that the evidence did not support for meeting or equaling Listings. (Tr. at 60-62) Dr. Amusa opined an RFC for the Plaintiff, testifying that the Plaintiff was limited to light exertional work; she could never climb ladders, ropes, or scaffolds; she could occasionally stoop, balance, kneel, crouch, crawl, and climb ramps and stairs; she could occasionally reach overhead, bilaterally; frequently reach in all other directions, bilaterally; she could frequently handle, finger, and feel with the left upper extremity; she could tolerate no more than occasional exposure to extreme cold; and she must avoid all exposure to workplace hazards. (Tr. at 62-63)

    <u>Dr. Gary T. Bennett, Psychological Expert Testimony:</u>

    During the initial administrative hearing, Dr. Bennett noted the Plaintiff's history of mental health treatment since at least 2018. (Tr. at 86-87) He opined that the Plaintiff could perform no more than simple, one or two-step repetitive tasks; she could not perform customer service work but could tolerate superficial/occasional interaction with the public and occasional contact with co-workers and supervisors; and she required a work environment free of any fast-paced work or strict production quotas. (Tr. at 88-89) During the supplemental hearing, Dr. Bennett testified that the current record, including the Plaintiff's treatment and medication prescribed by her primary care provider, indicated some improvement in the Plaintiff's depression. (Tr. at 42, 46-47)

    <u>The Plaintiff's Testimony:</u>

The Plaintiff testified that she would no longer be able to do any of her past jobs, especially waitressing because of her memory problems, and being on her feet all the time. (Tr. at 73) She stated that she drives her husband to work every day, which is about 10 to 15 minutes away, but she has problems focusing. (Tr. at 74) The Plaintiff also endorsed having trouble reaching, especially when reaching to the side to get a cup or something; she stated that she is unable to pick something up off the shelf overhead. (Tr. at 79-80) She can carry a full gallon of milk and a couple of bags of groceries. (Tr. at 80)

<u>The Vocational Experts Testimonies:</u>

During the initial administrative hearing, a vocational expert testified that a hypothetical individual with the Plaintiff's age, education, vocational profile and the controlling RFC as determined by the ALJ, *supra*, could perform appropriate light jobs such as a price marker, machine operator, and office helper. (Tr. at 90-92) The vocational expert testified that her testimony was consistent with the DOT. (Tr. at 92)

During the supplemental administrative hearing, a different vocational expert testified. (Tr. at 49-54) The vocational expert identified two positions from the Plaintiff's past relevant work, cashier and restaurant manager, both light exertional jobs. (Tr. at 49) In response to the ALJ's hypothetical individual with the Plaintiff's age, education, vocational profile and the controlling RFC as determined by the ALJ, *supra*, the vocational expert testified that she could perform appropriate light jobs such as a folder, marker, and sorter. (Tr. at 49-50) When asked by the ALJ why her job numbers in the national economy for the marker position differed from the prior vocational expert's numbers, she responded that she obtained her numbers from SkillTRAN Job Browser, but the DOT numbers were the same, thus the same job. (Tr. at 50)

The vocational expert then testified in response to the Plaintiff's representative's questioning:[4]

Q       . . . Ms. Henzes, would you agree that the Selected Characteristics of Occupations, the SCO[5], defines reaching as extending hands and arms in any direction?

A       Yes.

Q       Would you agree that neither the SCO or the DOT further define reaching by specific direction?

A       They neither, yes, the don't define it further. Correct.

Q       Can you explain to me how you, for instance, the price marker position and the folder, at first glance, both require frequent reaching. Can you give me a percentage of those jobs that are representative timeframe for those jobs that would require the overhead reaching?

A       So the folder would not require any overhead reaching. And what was the second one you're asking then?

Q       The price marker. They, they both list those as frequent reaching.

A       Correct. It's –

Q       So my question – go ahead.

A       Right. That one would not require any overhead reaching as well.

Q       And the same for the sorter? There's no overhead reaching?

A       Correct, no.

Q       Okay. So even though that the job descriptions say that there's frequent reaching, your testimony is that there's no overhead reaching in any of those three jobs?

---

[4] Because this specific issue has been raised on appeal, the undersigned reproduces the pertinent colloquy *verbatim*.

[5] **S**elected **C**haracteristics of **O**ccupations Defined in the Revised Dictionary of Occupational Titles.

A      That's correct.

**\*\*\*\*\*\*\*\*\*\***

Q      Okay, okay. And those jobs, the mail sorter was last updated in '87. The folder was last updated in '78. And let me find the other one, the price marker was last updated in '77.

      Can you tell me that even since the updated versions of those jobs there's still no reaching requirement for overhead even in the way that they're currently performed?

A      Well that's exactly it. The reaching as per the DOT, it just encompasses in all areas. The remaining is based on observation, experiencing, and working with employers.

(Tr. at 51-52, 53)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

As noted *supra*, the Plaintiff has set forth numerous grounds for error in support of her appeal of the Commissioner's final decision finding that the Plaintiff was not disabled. The undersigned discusses same in reverse order herein for practical purposes.[6]

<u>Evaluation of Symptoms in Disability Claims:</u>

The Plaintiff asserts that the ALJ did not consider the entire record in evaluating her "credibility" in established the RFC as required by SSR 16-3p. (ECF No. 8 at 3, ¶ 7, 17-20) SSR 16-3p clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs adjudicators to use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be

---

[6] It is noted that several of the Plaintiff's enumerated "Statement of Issues" in support of her appeal appear to have similar legal underpinnings, particularly as they relate to alleged errors committed at the last two steps in the sequential evaluation process, discussed *infra*. (See ECF No. 8 at 2-3, ¶¶ 1, 2, and 3; ¶¶ 5 and 6)

evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 416.929(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. § 416.929(c)(3).

The Plaintiff indicates that although the ALJ acknowledged her complaints of migraine headaches, she nevertheless ignored her history of these symptoms and treatment, but the ALJ also failed to consider the Plaintiff's chronic pain in assessing her RFC. (ECF No. 8 at 19-20) To the extent the Plaintiff contends the ALJ's decision "excludes the consideration of chronic pain, degenerative disc disease, and neck pain with intermittent headaches with neck spasms" (Id. at 18), this argument lacks merit: at the second and third steps in the sequential evaluation process, the ALJ explicitly discussed these impairments (Tr. at 18-19). Specifically, the ALJ noted that as a result of the Plaintiff's 2016 motor vehicle accident, she "sought emergency room treatment in 2016 and 2017 with episodes of migraines" and that during follow up visits to her primary care provider, the Plaintiff reported "frequent headache episodes; her diagnoses included headaches with history of migraines and chronic neck pain from old motor vehicle accident." (Tr. at 18) Although the Plaintiff was advised to follow up with her treating neurologist, the ALJ observed that the record did not indicate that she had. (Id.) However, the ALJ acknowledged that the Plaintiff continued follow up care with her primary care provider and continued to report migraines (Tr. at 18, 631-662, 1989-2088, 2089-2098, 2187-2231, 2272-2296).[7] The ALJ also noted that the Plaintiff took medication to control her migraine symptoms, as well as for her pain and muscle spasms. (Tr. at 18, 468-469)[8] From this evidence, the ALJ determined that the Plaintiff's

---

[7] It is noted that the majority of these medical records predate the relevant period under review for this claim.

[8] This citation concerns the form "Claimant's Medications", dated February 8, 2022.

"headaches appear to be secondary to her neck injury and are not a significant problem. They are mentioned only in subjective complaints and in treatment records' history lists." (Tr. at 18)[9]

Regarding the Plaintiff's "degenerative disc disease", or rather, her degenerative joint disease and facet arthritis as found by the ALJ to be severe impairments, the ALJ explicitly considered the Plaintiff's symptomology in light of the evidence at step three: in October 2020, during a consultative examination, the evidence showed that the Plaintiff "walked without difficulty or assistive devices; sensation was intact; she was able to tandem walk without difficulty; straight leg raising was negative; range of motion was decreased in the claimant's cervical spine; no tenderness or pain to palpation was found in her spine." (Tr. at 19, 625-630) The ALJ also noted that during a follow-up visit with her primary care provider in August 2021, the Plaintiff exhibited full range of motion in her extremities, "although there was some pain with left shoulder movement." (Tr. at 19, 2272-2296) By February 2022, the Plaintiff's provider found no spinal tenderness and full range of motion in her extremities, though the Plaintiff had "some left greater trochanter pain and tenderness with pain going down the left leg." (Id.)

While the Plaintiff does not specify how the ALJ's evaluation of her subjective complaints violated legal standards, other than conclusively stating that she improperly discounted her allegations, it must be emphasized that "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." See Manigo v. Colvin, 2015 WL 74954, at *5 (D.S.C. Jan. 6, 2015) (quoting Craig

---

[9] To the extent the Plaintiff contends the ALJ's second step finding that her headaches are non-severe impairments by "alluding to a Failure to Follow Prescribed Treatment (FFPT) justification" (ECF No. 8 at 19), this argument is speculative; moreover, it is of no moment, because clearly, the ALJ considered the Plaintiff's non-severe impairments and did not "exclude" or ignore this evidence.

v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)). Indeed, "there is no particular language or format that an ALJ must use in his . . . analysis as long as there is sufficient development of the record and explanation of the findings to permit meaningful review." Clark v. Comm'r of Soc. Sec., No. 09–417, 2010 WL 2730622, at *17 (E.D. Va. June 3, 2010) (quoting Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004)). The ALJ's opinion is sufficient if it "not only sets forth the facts used in rendering his decision, but it also provides a thorough examination of the medical evidence." Id.

Recently, the Fourth Circuit held that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall record actually supported her subjective complaints and demonstrated she would be unable to engage in substantial gainful activity. Id. Another significant, if not critical, aspect of the Arakas holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. For purposes herein, this Court must determine if the subject ALJ's analysis relied primarily on the lack of objective medical evidence as the reason for discounting the Plaintiff's subjective complaints.

In the written decision, the ALJ noted the Plaintiff's testimony from the administrative hearings:

> She is unable to work due to pain in her neck, shoulders, and back, more intense on the left; she experiences pain in her right hip and leg when driving. She testified that she experiences occasional episodes of headaches and has some trouble sleeping. The claimant testified that pain symptoms persist and recur, despite treatment with injection and medication. She frequently changes positions in attempts to relieve pain symptoms and testified that her back pain symptoms generally improve if she is up and moving around. She spends a significant amount of time during the day reclined with a pillow and her legs elevated. The claimant also described symptoms of vertigo that occur if she closes her eyes in the shower or when she looks down, bends over, or tilts her head forward. The claimant testified that she has always taken medication to treat symptoms of depression and that her depressive symptoms recur if she does not take prescribed medications. She also experiences symptoms of anxiety. She described memory limitations and difficulty concentrating. She testified that she tends to isolate and she is not good with people. She also testified that she is physically unable to stand for long periods. While she drives her husband to work daily, she testified that she occasionally loses focus and forgets where she is going. The claimant admitted a history of drug addiction and testified that she continues to smoke marijuana when she is upset or anxious. At the supplemental hearing on March 8, 2022, the claimant described her history of good work ethic, but testified that she currently can work no more than two hours per day. She testified that she continued to experience pain symptoms and was frequently distracted with household chores.

(Tr. at 23) After properly performing the two-step process, the ALJ proceeded to review the evidence of record and reconciled it with the Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms, and found that they "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Id.)

26

The ALJ then reviewed the medical records, discussed *supra*, and made several significant observations concerning the Plaintiff's physical impairments:[10] regarding her left shoulder strain/muscle spasm as well as left side sciatica, the treatment records showed that she continued to have spasms in her left neck and shoulder in January 2020, and in November 2020 she was given an injection for her ongoing low back pain associated with left sciatica (Tr. at 24); a consultative examination in October 2020 revealed that the Plaintiff walked without difficulty or assistive devices, her sensation was intact, she was able to tandem walk without difficulty, straight leg raising was negative, range of motion was decreased in the cervical spine, and there was no tenderness or pain to palpation found in her spine (Tr. at 25); a follow-up visit with her primary care provider in August 2021 indicated continued reports of left shoulder pain due to the motor vehicle accident in 2016 and the examination revealed full range of motion in all extremities, although the Plaintiff had some pain with left shoulder movement for which the Plaintiff received an injection for symptom control; another follow up visit in February 2022 indicated continued reports of left leg and hip pain and the examination revealed no tenderness in the Plaintiff's back and full range of motion in her extremities, although she had some left greater trochanter pain and tenderness with pain going down her left leg – the diagnoses included left greater trochanteric bursitis, chronic muscle spasm, and chronic generalized pain (Id.).

The ALJ then considered Dr. Amusa's testimony from the initial hearing, again recognizing that the Plaintiff was treated by her primary care provider for neck pain and associated intermittent headaches, as well as neck spasms, including injections for treating her symptoms,

---

[10] The undersigned primarily focuses on the ALJ's review of the medical and other evidence of record that are dated closer to the relevant period on appeal herein – from July 17, 2020 through April 11, 2022.

and Dr. Amusa's own RFC opinion[11] as to what the Plaintiff remained capable of doing despite her physical impairments and related symptoms. (Id.) The ALJ also acknowledged that evidence was received post-hearing, but found it "not significant and was somewhat duplicative"[12], and therefore did not change the validity of Dr. Amusa's opinion. (Tr. at 25-26) In addition to Dr. Amusa's testimonial opinion, the ALJ considered the prior administrative medical opinions/findings provided by the State agency consultants, including their own RFC determinations, ultimately finding the opinions were not persuasive, although at the time given, they were supported by the record, however, recent evidence suggested further restrictions. (Tr. at 28) Lastly, the ALJ considered the prior ALJ decision issued on December 3, 2018, again noting that the current record, while supporting a finding that the Plaintiff remained capable of light exertional work, necessitated additional postural limitations as well as some manipulative limitations. (Tr. at 29)

In addition to little corroboration with the objective medical evidence, the ALJ also recognized that despite her impairments, both physical and mental, other evidence of record indicated the Plaintiff's allegations were not so limiting: she is able to shop in stores and via telephone, to drive her husband work as well as transport her son to and from school, to go grocery shopping a few times a week, to socialize with others in person, including visiting her dad and attend church, to occasionally running errands, to completing minimal household chores with

---

[11] The Plaintiff's argument that the ALJ "appears to give controlling weight" to Dr. Amusa's opinion, but then "cherry picks" the physician's "opined list of impairments" makes little sense, given that the ALJ adopted Dr. Amusa's opined RFC assessment which clearly considered the Plaintiff's impairments – including those Dr. Amusa determined from the record of evidence. (ECF No. 8 at 18) To that extent, this argument lacks merit.

[12] Post-hearing evidence discussed further, *infra*.

frequent rest breaks, to prepare lunch for her husband, to taking care of her household dogs, as well as sweeping, and cooking (Tr. at 20, 21).

      In Hines v. Barnhart, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1995)); see also, Shelley C. v. Commissioner of Social Security Administration, et al., No. 21-2042, 61 F.4th 341 (4th Cir. Feb. 22, 2023) (expanding Arakas governing subjective statements of chronic depression given its unique and subjective nature). Following her review of the medical and other evidence of record, while the ALJ recognized the Plaintiff suffers from ongoing pain, muscle spasms, and headaches, she nevertheless remained capable of a range of light work.

      Given the conflicting evidence consisting of the Plaintiff's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether the Plaintiff is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig, 76 F.3d at 589. The ALJ provided an adequate review that included not only the Plaintiff's testimony, but also the objective medical evidence of record and other evidence of record. In short, the ALJ provided a fairly thorough and adequate review of the Plaintiff's subjective complaints, reconciled them with the medical and other evidence of

record, and ultimately determined that her symptoms did not limit her to the extent alleged.[13] Indeed, the law does not require one to be pain-free or experience no discomfort in order to be found not disabled. Hays v. Sullivan, 907 F.2d 1453, 1458 (4ᵗʰ Cir. 1996). In this case, it is clear that the ALJ did not select only those portions from the objective medical evidence that failed to support the Plaintiff's allegations of disabling impairments, as she also considered the objective medical evidence that did support her claims, as well as her testimony and other evidence, both supporting and non-supporting.

Finally, the Plaintiff complains that the ALJ "never mentioned" the post-hearing evidence which included "multiple witness statements, an additional statement from the claimant, and additional testimony from the claimant submitted in the form of interrogatories prior to the supplemental hearing" (ECF No. 8 at 18; citing Tr. at 65-84, 428-434, 437). The undersigned notes that Tr. at 65-84 is a portion of the transcript of the initial administrative hearing, and that Tr. at 437 is a page from the Plaintiff's representative's brief dated August 30, 2021, however, the remaining citation concerns the third party "witness statements" as well as the Plaintiff's own "additional statement." It is further noted that the Plaintiff's "Supplemental Pre-Hearing Interrogatories – Statement of Claimant" is found in Exhibit B32E, dated March 1, 2022 (Tr. at 474-482).

" '[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision[.]' " Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4ᵗʰ Cir. 2014) (quoting

---

[13] Johnson v. Barnhart, 434 F.3d 650, 653 (4ᵗʰ Cir. 2005) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." (quoting Craig, 76 F.3d at 589)).

Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2006) (*per curiam*)); see also Call v. Berryhill,
Civil Action No.2:17- CV-02292, 2018 WL 4659342, *4 (S.D.W. Va. Sept. 28, 2018) ("The Court
finds the ALJ's summaries and explanations sufficiently display a consideration of all the
evidence, including that cited by Plaintiff. While this evidence was not explicitly mentioned, the
holding in Reid applies to the instant case and a failure to specifically mention a single CR scan
which noted `mild soft tissue swelling' in a transcript of well over 800 pages does not constitute
'evidence to the contrary.' ")(Chambers, J.). While the ALJ may not have specifically mentioned
the Plaintiff's witness statements or her responses to written interrogatories, the ALJ stated that
she considered all the evidence of record. See Tr. at 16 ("After consideration of all the evidence. .
."); Tr. at 17, 22 ("After consideration of the entire record. . ."; and Tr. at 23 ("After consideration
of the evidence . . ."). Having so stated, this Court should "take her at her word." Reid, 769 F.3d at
865 (4th Cir. 2014) ("The Commissioner, through the ALJ and Appeals Council, stated that the
whole record was considered, and, absent evidence to the contrary, we take her at her word.")

While the ALJ did not specify exactly what evidence she received post-hearing, those
exhibits are noted in the "List of Exhibits" attached to the written decision; in short, the fact that
the ALJ even mentioned receiving post-hearing evidence indicates that she *did* consider these
exhibits when rendering her decision. Moreover, from the undersigned's review, this post-hearing
evidence was, as characterized by the ALJ, "somewhat duplicative" to the evidence already before
her and discussed thoroughly throughout the written decision.

Accordingly, the undersigned **FINDS** that the ALJ's subjective symptoms analysis
complied with the pertinent Regulations and controlling case law and is based upon substantial
evidence. The undersigned further **FINDS** the ALJ's discussion of the objective and other

evidence of record in her evaluation of the Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms, and that the ALJ's conclusion that her statements were inconsistent with the evidence of record complied with the applicable law and is supported by substantial evidence.

<u>Moderate Limitations Determined via the Psychiatric Review Technique:</u>

As noted *supra*, the Plaintiff contends that the ALJ failed to properly assess her mental functioning via the psychiatric review technique, resulting in a deficient RFC assessment – essentially, the ALJ's finding that the Plaintiff had moderate limitations in the "paragraph B" criteria are not explained or accommodated in the RFC determination. As an initial matter, as pointed out by the Commissioner (ECF No. 11 at 16)[14], the ALJ explained that the limitations she found are not an RFC assessment, but simply used to rate the Plaintiff's mental impairments earlier in the sequential evaluation process. (Tr. at 22) It is noted that the Plaintiff does not specify what evidence the ALJ neglected to acknowledge or what is inconsistent with her conclusions as to her moderate limitations in the four broad areas of mental functions or even with the RFC determination.[15] In any event, the ALJ herein initially recognized that the Plaintiff had severe

---

[14] Citing <u>Wall v. Saul</u>, No. 2:20-cv-00460, 2021 WL 5225792, at *8 (S.D.W. Va. Jun. 2, 2021) ("Put simply, contrary to Claimant's assertion, mental limitations identified using the psychiatric review technique do not necessarily indicate work-related functional limitations that must be present in the RFC assessment."), *report and recommendation adopted*, 2021 WL 5230989, at *1 (S.D.W. Va. Nov. 9, 2021); <u>Hedrick v. Saul</u>, No. 2:20-cv-00449, 2021 WL 5230735, at *7 (S.D.W. Va. May 21, 2021) (same) (citing <u>Mascio v. Colvin</u>, 780 F.3d 632, 638 (4th Cir. 2015) (noting that a claimant's "moderate limitation in concentration, persistence, or pace at step three" may not "affect [her] ability to work" and thus "does not translate into a limitation in [her RFC]")), *report and recommendation adopted*, 2021 WL 5230987, at *1 (S.D.W. Va. Nov. 9, 2021).

[15] Furthermore, while the Plaintiff does not identify any evidence from the record that contradicts the ALJ's findings, the overall evidence of record, particularly with respect to the psychological expert's testimony and the psychological examiner's findings, are consistent with the ALJ's mental RFC assessment.

mental impairments – depression and anxiety – and then discussed the evidence that supported the moderate limitations findings. (Tr. at 18, 19-22)

Regarding the ALJ's finding moderate limitations in the Plaintiff's abilities "[i]n understanding, remembering, or applying information, the ALJ found support not only from the Plaintiff's own testimony, *supra*, and in her "Function Report" (Tr. at 20, 354-363, 373-380), the ALJ also found support in Mr. Legg's observations during two consultative evaluations: mental status examinations indicated the Plaintiff's memory was within normal limits. (Tr. at 20, 663-667, 2251-2259)

As for the Plaintiff's functioning in "interacting with others", once again, the ALJ found moderate limitations, and again noted the Plaintiff's testimony, her statements from her applications for SSI: the Plaintiff indicated that she socialized with others, enjoyed visiting her father and going to church (although not during the Covid-19 crisis), got along very well with her husband, son, father, siblings, although she reported not having any close friends and occasionally seeing her mother; she also reported having no problems getting along with family, friends, neighbors, or authority figures. (Tr. at 20, 354-363, 373-380) Again, the ALJ recognized Mr. Legg's findings in this area of functioning: the Plaintiff presented as cooperative with a serious attitude, dysphoric mood and flat affect, although social functioning was within normal limits. (Tr. at 20, 663-667, 2251-2259)

The ALJ's findings in the area of concentrating, persisting, or maintaining pace were similarly supported by the Plaintiff's own testimony and application documents, noting difficulties in maintaining focus and attention (Tr. at 21, 354-363, 373-380). The ALJ also considered Mr. Legg's conclusion from the first evaluation that the Plaintiff's concentration, persistence and pace

were within normal limits, though in the second evaluation, her concentration was deemed only mildly deficient, while her persistence and pace remained within normal limits. (Tr. at 21, 663-667, 2251-2259)

Finally, regarding the Plaintiff's abilities in adapting or managing oneself, the ALJ again reviewed the Plaintiff's testimony along with her statements within the "Function Report" noting she woke her husband and son and got them to work and school, packed their lunches, did household chores with frequent rest breaks, prepared family meals, and used marijuana on a daily basis. (Tr. at 21-22, 354-363, 373-380) Once again, the ALJ found support for her findings from Mr. Legg's evaluation reports, which corroborated the Plaintiff's testimony and application statements, and that he observed the Plaintiff to be appropriately dressed and groomed. (Tr. at 21-22, 663-667, 2251-2259)

Of further interest here is that the ALJ also reviewed the Plaintiff's mental health treatment history, noting that she had been treated by her primary care provider for her anxiety, depression, and memory loss due to her motor vehicle accident since 2016. (Tr. at 26) The Plaintiff then started "specialized mental health treatment at Seneca Health Services" for her anxiety and depression in 2018, but by December that year, she discontinued her medications "because she 'got saved' ", and by November 5, 2020, she presented to her primary care provider reporting she had discontinued her medications as well as symptoms related to depression and anxiety, poor sleep and irritability. (Id.) However, by November 24, 2020, after having restarted her medication, the Plaintiff reported

that her depression and anxiety symptoms "greatly improved" and continued to improve after her medications were increased to provide increased efficacy.[16] (Tr. at 26, 631-662, 2187-2231)

The ALJ also reviewed Dr. Bennett's testimony from both administrative hearings, and his opinions as to the Plaintiff's mental RFC, which notably, the Plaintiff does not appear to challenge:

> Overall, Dr. Bennett concluded that the record supports diagnoses of major depressive disorder, generalized anxiety disorder, and cannabis use disorder. He opined moderate limitation in the claimant's ability to understand, remember, or apply information; moderate limitation in her ability to interact with others; moderate limitation in her ability to concentrate, persist, or maintain pace; and moderate limitation in her ability to adapt and/or manage herself. He opined that the claimant could perform simple, repetitive tasks. She could not do customer service work, but could have superficial/occasional contact with the public and occasional contact with supervisors and co-workers. She required a low stress work environment, defined as involving no fast-paced work or strict production quotas.

(Tr. at 27) As noted *supra*, this opinion was adopted in its entirety within the mental portion of the RFC assessment. Additionally, the ALJ found this opinion persuasive, for a number of reasons: he appeared at both hearings; heard the testimony of Dr. Amusa regarding the Plaintiff's brain imaging as well as the testimony of the Plaintiff herself; he cited to specific exhibits in the record and was available to answer questions, if necessary, to clarify his opinion; he is a mental health expert certified by the SSA; and he had access to the most complete record concerning the Plaintiff's mental impairments and their treatments.[17] (Tr. at 27-28) Moreover, as noted *supra*, the Plaintiff's representative had no objection to his testimonies, or questions, because he was "very thorough." (Tr. at 47, 89)

---

[16] See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.")

[17] See Wall, 2021 WL 5225792, at *8 ("the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (quoting Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986) (internal citation omitted)).

In short, "unlike in <u>Mascio</u>,[18] the ALJ in this case addressed [the Plaintiff's mental impairments] including her moderate limitations" the ALJ found in each of the four broad areas of mental functioning; the ALJ explained why the psychological evidence including the Plaintiff's own statements supported the aforementioned mental limitations in the RFC allowing for meaningful judicial review. See <u>Shinaberry v. Saul</u>, 952 F.3d 113, 121-122 (4th Cir. 2020).

Accordingly, the undersigned **FINDS** that the ALJ fully accounted for the Plaintiff's moderate limitations in "paragraph B" criteria in the RFC, and the mental portion of the RFC is supported by substantial evidence.

<u>Fourth Step Finding – Past Relevant Work:</u>

As noted *supra*, the Plaintiff takes issue with the ALJ's fourth step finding – where the vocational expert at the supplemental hearing ostensibly was unaware of all the evidence concerning the Plaintiff's past relevant work – thus resulting in an incomplete step four analysis.[19] While the undersigned has not found any other courts that have considered this particular issue, it is nevertheless interesting that the ALJ determined, perhaps presumably, that the Plaintiff was unable to perform her past relevant work – a step in the sequential evaluation process for which the Plaintiff bore the burden of proof. To that end, the undersigned cannot find error, as the ALJ may have relieved the Plaintiff of her burden.

---

[18] <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th Cir. 2015).

[19] The Plaintiff states that the vocational expert's review and characterization of her prior work "was based solely on information contained within Exhibit 3E." (ECF No. 8 at 17, citing Tr. at 49) The undersigned finds this assertion not entirely accurate, because although the vocational expert testified that she was referencing Exhibit 3E, she did not indicate one way or another that this was the "sole" source of her information regarding the Plaintiff's past relevant work. To that extent, the undersigned is remiss as to how this caused the Plaintiff any prejudice at this step of the sequential process analysis, as she carried the burden of proof at this stage.

In any event, although the ALJ did not ask either vocational expert whether the Plaintiff (or a hypothetical individual with the Plaintiff's vocational history, education, age, and RFC) could perform her past relevant work, it is significant that neither vocational expert opined that the Plaintiff *could* have performed her past relevant work. Instead, both provided alternative occupations that the Plaintiff, or hypothetical individual, could have performed, which implies that neither expert determined that the Plaintiff remained capable of performing past relevant work as a result of her limitations. While it is true that the ALJ incorrectly noted that the "vocational expert responded that such an individual would be unable to perform the claimant's past relevant work" the ALJ nevertheless determined that the Plaintiff was unable to perform her past relevant work at step four as it was actually or generally performed. (Tr. at 29) To that extent, the undersigned would agree with the Commissioner that this "error" is harmless (ECF No. 11 at 18-19) [20], as mentioned above, it relieved the Plaintiff of her burden of proof at step four, and propelled the analysis to the fifth and final step, where the ALJ then bore the burden of proving the Plaintiff remained capable of work notwithstanding her impairments.

Accordingly, the undersigned **FINDS** the ALJ's fourth step determination is supported by substantial evidence.

DOT Consistency at Fifth Step of Sequential Evaluation Process:

The Plaintiff also argues that, at the final step in the sequential evaluation process, the ALJ determined the Plaintiff could perform light work with additional limitations, with representative jobs including folder, marker, and sorter, according to the vocational expert's testimony, however,

---

[20] Citing Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994).

the ALJ failed to address an apparent conflict between the testimony and DOT/SCO. (ECF No. 8 at 10-11)

At step five, with the assistance of vocational expert testimony, the ALJ determined the Plaintiff's age, education, work history and RFC that she remains capable of performing several unskilled jobs: from the August 2021 hearing, the vocational expert opined that the Plaintiff could perform the work of a price marker (DOT code 209.587-034), a machine operator (DOT code 207.685-014), and an office helper (DOT code 239.567-010); from the March 2022 hearing, the vocational expert opined that the Plaintiff could perform the work of a folder (DOT code 369.687-018), a marker (DOT code 209.587-034), and a sorter (DOT code 209.687-026) (Tr. at 30). The ALJ then determined that pursuant to Social Security Ruling ("SSR") 00-4p, the vocational expert's testimony is consistent with the information contained in the DOT (Id.). The ALJ noted

> [t]o the extent components of the [RFC] contain  limitations that are not directly addressed by the [DOT], e.g. distinctions in climbing, the vocational expert stated that the offered testimony was based significantly in part on the expert's education and experience, which are reflected in the expert's statement of qualifications in the record. The undersigned finds the expert qualified to address such issues and accepts the testimony.
>
> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and [RFC], the claimant is capable of making a successful adjustment to other work that exists in significant numbers of jobs in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. at 30-31)

> The Fourth Circuit has held "Although we could guess what these occupations require in reality, it is the purview of the ALJ to elicit an explanation from the expert ..." Pearson v. Colvin, 810 F.3d 204, 211 (4th Cir. 2015). The duty rests with the ALJ, not a reviewing court, to find facts and resolve conflicts. Radford v. Colvin, 734 F.3d 288, 296; see also Brown v. Colvin, 639 Fed. App'x. 921, 923, 2016 WL 50298, at *2 (4th Cir. Feb. 9, 2016) ("We remand to avoid engaging in

fact-finding 'in the first instance' and to allow the ALJ to further develop the record so that we can conduct a meaningful judicial review"). And, as the Fourth Circuit has repeatedly made clear, the ALJ must provide a sufficient explanation of his findings to allow for meaningful appellate review. See Mascio v. Colvin, 780 F.3d 362, 637 (4th Cir. 2015) ("Because we are left to guess about how the ALJ arrived at his conclusion on [Plaintiff's] ability to perform relevant functions and indeed, remain uncertain as to what the ALJ intended, remand is necessary."); Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986) (holding that without an adequate explanation, "it is simply impossible to tell whether there was substantial evidence to support the determination").

See Cunningham v. Berryhill, No. 3:16-cv-02525, 2017 WL 1259587 (S.D.W. Va. Mar. 31, 2017) (Tinsley, M.J.). The pertinent law is clear that where there is an apparent conflict between a vocational expert's testimony and the DOT, the adjudicator has an affirmative responsibility to ask about the conflict between the testimony and the information provided in the DOT. Policy Interpretation Ruling: Titles II And XVI: Use Of Vocational Expert And Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions, SSR 00-4p, 2000 WL 1898704, at *4; see also Keller v. Berryhill, 754 Fed. App'x. 193, 199 (4th Cir. 2018).

There is no question that it remains the exclusive duty of the ALJ to identify any apparent conflicts in the evidence and to resolve them. At the fifth step of the sequential evaluation process, the burden of proof shifts to the ALJ because "[i]n order to support a finding that you are not disabled at this fifth step . . . we are responsible for providing evidence that demonstrates that other work exists . . . that you can do, given your residual functional capacity and vocational factors." See 20 C.F.R. § 416.960(c)(2). In determining the existence of jobs that a claimant can perform, the ALJ will consider both the DOT and a vocational expert's testimony. Id. § 416.966. Indeed, SSR 00-4p expressly allows the ALJ to rely upon a vocational expert's "experience in job placement or career counseling" among reasonable bases for relying on the evidence from the

vocational experts rather than the DOT. See SSR 00-4p, 2000 WL 1898704, at *2.

Both parties acknowledge that the jobs identified by the vocational experts each required frequent reaching. At the initial hearing, when asked if her testimony was consistent with the DOT, the vocational expert stated that it was, without any further questioning by the ALJ as to whether the occasional overhead reaching restriction may conflict with any of the jobs' requirements. (Tr. at 92) At the second hearing, reproduced *verbatim*, *supra*, although the ALJ herself did not ask the vocational expert if her testimony was consistent with the DOT, the Plaintiff's representative elicited testimony that explained that none of the jobs identified required overhead reaching, but required frequent reaching. (Tr. at 51-52) The question presented here is whether the Plaintiff herself resolved the apparent conflict, and whether this satisfies an adjudicator's obligation at the fifth step in the sequential evaluation process.

For starters, this case is unusual as far as the ALJ held two hearings and that two different vocational experts testified, however, more significant is the fact that the ALJ erred at the first hearing by merely asking the vocational expert if there were any conflict without further explanation. See Henderson v. Colvin, 643 Fed.Appx 273, 277 (4th Cir. 2016) (citing Pearson v. Colvin, 810 F.3d 204, 209 (4th Cir. 2015)). At the supplemental hearing, there is no dispute that there were apparent conflicts between the RFC and the vocational expert's testimony, as none of the jobs identified during either hearing were clear as to whether overhead reaching was included in the frequent reaching requirements. However, notwithstanding SSR 00-4p and Pearson's requirement that an ***ALJ*** must independently identify conflicts between the expert's testimony and the DOT, and to resolve same, in this case, the ***Plaintiff*** took charge of resolving the apparent

conflict by eliciting an explanation from the expert.[21] To that end, the ALJ reasonably relied on this testimony despite not having identified the apparent conflict herself. See Pearson, 810 F.3d at 211 ("If the expert's explanation is reasonable, the ALJ can resolve the apparent conflict with the Dictionary and rely on the expert's testimony."); see, e.g., Carey v. Apfel, 230 F.3d 131, 146 (5th Cir. 2000) (in review for substantial evidence at the fifth step, finding that an ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so). In short, the ALJ's error was effectively cured during the supplemental hearing, by the Plaintiff's own representative, resulting in harmless error. See Jarrett v. Kijakazi, 2021 WL 3913585, at *4 (S.D.W. Va. Sept. 1, 2021) (quoting Keller v. Berryhill, 754 Fed.Appx. 193, 199 (4th Cir. 2018) ("As  general proposition, we apply the harmless error doctrine in reviewing a decision of the Commission denying a benefits claim.")) (Berger, J.).

Four out of the five jobs identified by the vocational experts in response to the ALJ's hypothetical each provide for a reasoning level of 2 (only the sorter position provides for a reasoning level of 3 pursuant to the DOT description). There is no dispute that the ALJ limited the Plaintiff to performing "no more than simple, repetitive tasks" and the Fourth Circuit has determined that there is no apparent conflict within the meaning of SSR 00-4p between a hypothetical or controlling RFC for simple, routine, repetitive tasks of unskilled work and a

---

[21] The undersigned has not found any cases that had a situation like the one presented here. While it is true that had the Plaintiff not elicited a reasonable explanation for the apparent conflict between the DOT and the vocational expert's testimony, the ALJ's reliance on this testimony would have been unfounded, and warranting remand per Pearson. This case is unusual because it  appears from the record that the ALJ relieved the Plaintiff's burden at the fourth step, and the Plaintiff relieved the ALJ's burden at the fifth step. This is not a situation where the burden of proof was actually shifted by the ALJ – there was an obvious error committed, but the Plaintiff, perhaps improvidently, fixed it by eliciting a rational explanation from the vocational expert, and there is no justifiable, let alone legal, reason why the ALJ could not rely upon that testimony in rendering her decision.

reasoning level of 2. See <u>Lawrence v. Saul</u>, 941 F.3d 140 (4th Cir. 2019). As noted by the parties, a reasoning level of 2 requires a worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." See, e.g., DICOT 209.587-034 (G.P.O.), 1991 WL 671802. From this description, these jobs do not present an actual or "apparent" conflict with the controlling RFC. See <u>Joshua B. v. Kijakazi</u>, No. 5:22-cv-00216, 2022 WL 18110019, at *7 (S.D.W. Va. Dec. 8, 2022), *report and recommendation adopted*, 2023 WL 36154, at *1 (S.D.W. Va. Jan. 4, 2023) (reasoning level 2 jobs do not present an actual or apparent conflict with controlling RFC for simple, repetitive tasks); see also, <u>Blevins v. Colvin</u>, No. 5:15-cv-14240, 2016 WL 6987169, at *16 (S.D.W. Va. Sept. 16, 2016) (citing <u>Rodgers v. Colvin</u>, 2015 WL 636061, at *6 (E.D.N.C. Feb. 13, 2015) (vocational expert testimony that someone restricted to simple, routine, repetitive tasks, low-production, low-stress environment, and no complex decision-making, constant change, or dealing with crisis situations could work as a merchandise price marker)), *report and recommendation adopted*, 2016 WL 6988502 (S.D.W. Va. Nov. 28, 2016); <u>Critchley v. Colvin</u>, No. 5:15–cv–08288, 2016 WL 3030211, at *8 (S.D.W. Va. May 4, 2016), *report and recommendation adopted*, 2016 WL 3033763 (S.D.W. Va. May 26, 2016) (finding ALJ's failure to question vocational expert about potential conflicts harmless where "no conflict, actual or apparent," existed). In short, the Plaintiff has failed to demonstrate that there is an *apparent unresolved conflict* between the vocational experts' testimonies regarding the limitation to simple, repetitive tasks and the DOT's indication that the four jobs identified above have a reasoning level of two. In this case, the ALJ's finding that there were no conflicts between the RFC and the testimonies as they relate to the mental RFC limitations without error.

The Plaintiff also contends that the vocational experts' testimonies are unreliable due to the discrepancies noted between the number of jobs in the national economy determined by the vocational expert at the first hearing, and those identified during the supplemental hearing. As noted *supra*, the second vocational expert testified that she obtained her job numbers by using the SkillTRAN database and the JobBrowser database, but could provide no reasoning or explanation for the discrepancies in the job numbers. Although the Plaintiff does not affirmatively state that there is a reduction of the number of jobs that would eliminate all the jobs identified at the supplemental or even initial hearings, it is noted that the cases within this Circuit are sparse on this particular issue. However, another court determined that an ALJ properly inquired as to whether there were any conflicts between a vocational expert's testimony and the DOT where there was no apparent conflict, thus, the ALJ was not obligated to independently investigate further. See Acevedo ex rel. Acevedo v. Colvin, 2014 WL 197738, at *5 (D.S.C. 2014) (District Court declined to adopt Magistrate Judge's recommendation for remand when ALJ relied upon vocational expert testimony reducing number of jobs by 50% and then an additional 30% based on controlling RFC where vocational expert affirmed her testimony was consistent with DOT, SCO and Department of Labor publications); see also, Newman v. Saul, 474 F.Supp.3d 345, 365 (D. Mass. 2020) (vocational expert's invocation of her experience was sufficient reasonable explanation for reduction from DOT job numbers, permitting hearing officer to rely on her testimony in making RFC finding).[22] Regardless, it is known that an ALJ need only identify one job existing in

---

[22] Notably, the District Court of Massachusetts deemed its holding compliant with the Supreme Court's determination in Biestek v. Berryhill, 139 S.Ct. 1148, 1155 (2019) that a hearing officer could rely upon the testimony of a vocational expert even though she refused to supply underlying data to support her conclusion, as the testimony itself constituted "substantial evidence." Id.; see e.g., Ford v. Saul, 950 F.3d 1141, 1160 (9th Cir. 2020) (quoting Buck v. Berryhill, 869 F.3d 1040, 1051 (9th Cir. 2017) ("[I]n the absence of any contrary evidence, a [vocational expert's] testimony is one

significant numbers in the national economy to meet the fifth step burden. See 20 C.F.R. § 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (in *one* or more occupations) . . ." (emphasis added).

Accordingly, the undersigned **FINDS** that the ALJ met her burden of proof at the fifth step of the sequential evaluation.

Ruling on Post-Hearing Objections:

As pointed out by the Commissioner (ECF No. 11 at 14, fn 5), the Fourth Circuit has not provided any guidance as to whether HALLEX is judicially enforceable, but other district courts within this circuit have held that HALLEX does not create judicially enforceable rights. See Young v. Colvin, 2014 WL 1874984, at *3 (W.D.N.C. May 9, 2014); Shrader v. Astrue, 2013 WL 1192315, at *3 (N.D. W. Va. Mar. 22, 2013); Harris v. Astrue, 2012 WL 7785082, at *6 (N.D. W. Va. Nov. 30, 2012), *report and recommendation adopted*, 2013 WL 1187151 (N.D. W. Va. Mar. 21, 2013); Melvin v. Astrue, 602 F. Supp. 2d 694, 704 (E.D.N.C. 2009); see also, Schweiker v. Hansen, 450 U.S. 785, 789 (1981) ("the Claims Manual is not a regulation. It has no legal force and does not bind the SSA."). In any event, "[t]he Fourth Circuit has yet to specifically address whether an ALJ must rule on all post-hearing objections, but district courts within this circuit have consistently held that ALJs need not address such objections." See Patricia Louise Revere v. Berryhill, 2019 WL 99303, at *4 (E.D. Va. Jan. 3, 2019) (citing Looney v. Berryhill, 2018 WL 3826778, at *13 (E.D. Va. Aug. 10, 2018) (holding ALJ had no duty to address objections the

---

type of job information that is regarded as inherently reliable, thus, there is no need for an ALJ to assess its reliability."); Welsh v. Colvin, 765 F.3d 926, 930 (8th Cir. 2014) (citing Jones v. Astrue, 619 F.3d 963 (8th Cir. 2010) (vocational expert reduced estimate of the number of jobs based on handling restrictions in RFC otherwise not provided for in DOT for those jobs determined to be a reasonable basis for ALJ's conclusions).

plaintiff made only in his post-hearing brief); Jenkins v. Colvin, 2016 WL 4373701, at *8 (W.D.N.C. Aug. 12, 2016) (finding that the plaintiff waived his post-hearing objection to VE testimony, because the plaintiff had the opportunity to challenge VE's testimony during the hearing and failed to do so); see also Rogers v. Berryhill, 2018 WL 1308952, at *4 (W.D.N.C. Mar. 13, 2018) (remanding and instructing ALJ to review the plaintiff's post-hearing objections only because the parties' made faulty arguments to the court and numerous other mistakes in reviewing the record)); see also, Curtis B. v. Comm'r of Soc. Sec., 2018 WL 4735624, at *5 (W.D. Wash. Oct. 2, 2018) (finding no error where ALJ's opinion did not address plaintiff's post-hearing objections because "by accepting the VE hearing testimony, the ALJ necessarily rejected plaintiff's post-hearing submissions"); Green v. Berryhill, 2018 WL 1278433, at *8 (S.D. Ala. Mar. 12, 2018) (affirming ALJ's decision despite failure to address post-hearing objections).

In this case, the Plaintiff's representative did not object to either vocational expert's testimony at the initial or supplemental administrative hearings, preferring to "reserve" any possible objections afterwards. (Tr. at 48, 89) Further, the record is clear that the Plaintiff's representative took advantage of the opportunities to ask the vocational experts questions during both hearings. In light of the circumstances presented in this matter, and under the auspices of the relevant jurisprudence governing post-hearing objections, the undersigned cannot find that the ALJ erred by failing to rule on the Plaintiff's post-hearing briefs.

The undersigned further **FINDS** the ALJ's unfavorable decision is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Judge confirm and accept the foregoing findings and **RECOMMENDED** that the District Judge **DENY** the Plaintiff's request for remand (ECF No. 8), **GRANT** the Defendant's request to affirm the decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: May 4, 2023.

Omar J. Aboulhosn
United States Magistrate Judge

47